IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


SHARON FIELDS                          :         CIVIL ACTION
                                          :
                                          :
       v.                            :
                                          :
VINCENT A. SATINSKY               :         NO.  10-2254
NFI INDUSTRIES, INC.              :

## <u>MEMORANDUM</u>

M. FAITH ANGELL                                      May 17, 2011
UNITED STATES MAGISTRATE JUDGE

## I. FACTUAL AND PROCEDURAL BACKGROUND

This matter was referred to me by the Honorable Eduardo C. Robreno to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73 by Order dated November 18, 2010. *See* Docket Entry No. 9. A Summary Trial was held before me on March 17, 2011.

Plaintiff Sharon Fields instituted this action against Defendants Vincent A. Satinsky and National Freight, Inc., incorrectly designated as NFI Industries, Inc., alleging their negligence in regard to a motor vehicle accident that occurred on November 19, 2008, between 11:00 and 11:30 p.m. Ms. Fields alleges that while she was operating her 2006 Nissan four-door sedan northbound on Route I-95 in Wilmington, Delaware, near the Delaware Avenue on-ramp, she was rear-ended by a truck driven by Mr. Satinsky. *See* Complaint ¶8. She states that she felt something hit the back of her car, then her car began spinning in a counterclockwise direction, moving from the right lane in which she was driving, across the center and left lanes of the highway. *See* N.T. 3/17/11 at 45-46. Her vehicle hit the left guardrail and subsequently spun clockwise back across the road, hitting the

right guardrail. *Id.* at 47. Finally, her car was hit once more as the vehicle driven by Mr. Satinsky "smashed up against [her] car". N.T. 3/17/11 at 48.

Traffic was light at the time, and Ms. Fields was unaware of Mr. Satinsky's vehicle until she was hit from behind. In fact, it was when she was spinning towards the center of the highway that she realized that it was a tractor-trailer that had impacted her car. *See* N.T. 3/17/11 at 46. She indicated that the truck was out of control, ending up in a jack-knifed position before straightening out and ultimately stopping on the right shoulder of the road. *Id.* at 47-48. Her car sustained quite a bit of damage and was declared "totaled". Plaintiff's Trial Exhibit 5.

After both vehicles came to a rest, Ms. Fields got out of her car, and Mr. Satinsky, in turn, got out of his truck and came quickly towards Ms. Fields. *See* N. T. 3/17/11 at 47, 48. Ms. Fields asserts that Mr. Satinsky was "hollering and screaming, and telling [her] to shut up and be quiet, that [she] wasn't hurt". N.T. at 48-49. While at the side of the road, Ms. Fields made a series of telephone calls on her cell phone to the daycare provider who was caring for Ms. Fields' granddaughter at the time, her daughter, her goddaughter, and her best friend. *See* N.T. 3/17/11 at 49, 50.

Ultimately, the police, an ambulance and emergency medical technicians arrived on the scene. The Police Report indicates that the movement of Ms. Fields' vehicle was described as "movements essentially straight ahead", and she received no traffic citation. Plaintiff's Exhibit 5. Ms. Fields was placed on a stretcher by EMT's and transported to Christiana Care Hospital. *See* N.T. 3/17/11 at 53, 54; Plaintiff's Trial Exhibit 20. Ms. Fields describes herself as "hysterical" when she got to the hospital. N.T. 3/17/11 at 54, 113. She was not bleeding, and there was no visible bruising on her body. *See* N.T. 3/17/11 at 113. Ms. Fields did indicate, though, that there "was

2

bruising to [her] body that you couldn't see, but [she] could see". N.T. 3/17/11 at 113. She was diagnosed with "neck/back strain". Plaintiff's Trial Exhibit 20. Ms. Fields was discharged from the emergency room, and she was taken home by her daughter. *Id.*; Defendants' Trial Exhibit 15.

Mr. Satinsky, in turn, testified that on the night of the accident, he was driving a 1994 Freightliner Century Class tractor trailer on his regular route as a driver for National Freight, Inc. He asserts that he was in the right-hand lane going north on I-95, when he "felt the truck rock a little bit". N.T. 3/17/11 at 154. He put on his brakes and began slowing down. At that point, he saw Ms. Fields' car coming in front of the truck. She traveled past the front of the tractor, spun around, hit the guardrail on the left-hand side of the highway, came back in front of the truck and spun around again, hitting the guardrail on the right-hand side, where she came to a rest. *See* N.T. 3/17/11 at 154-155. He indicates that Ms. Fields hit his front axle outside tire, careened off, went in front, hit the guardrail, came back around and banged into the right-hand guardrail and came to rest. *Id.* at 154, 156. His rear tire skidded, but the truck did not jackknife. *Id.* at 157. He states that he did not impact Ms. Fields' car again after she bumped into his tire. *See* N.T. 3/17/11 at 160, 171-172. There was no damage to Mr. Satinsky's vehicle, but for a mark on his tire. *Id.* at 161, 186. The Police Report indicates that the movement of Mr. Satinsky's truck was described as "essentially straight ahead", and he received no traffic citation. N.T. 3/17/11 at 191; Plaintiff's Exhibit 5.

Mr. Satinsky testifies that he parked his truck in front of Ms. Fields' car on the right side of the road, and ran back to her car to see if she was all right. *See* N.T. 3/17/11 at 162. He reports that she was screaming at him, "why did you hit me?"; whereupon, he replied "I didn't hit you, you hit me". He further states that, upon his asking Ms. Fields' how she was, she replied "I'm a little shook up, but I seem to be okay". N.T. 3/17/11 at 162. He, too, remembers the telephone calls made by

3

Ms. Fields; in fact, he remembers being handed her phone so that he could tell her daughter that she was all right. *See* N.T. at 3/17/11 at 163. Mr. Satinsky states that he also made a phone call to his company to report the accident. *Id.* at 184. Mr. Satinsky further reports that Ms. Fields appeared to be calm as they waited for the police and ambulance to arrive on the scene. *Id.* at 164, 181-182.

## II. ANALYSIS

### A. Negligence Claim

All parties agree that it is Delaware law that governs this matter. *See* N.T. 3/17/11 at 199. Generally, automobile operators in Delaware must exercise reasonable care under the circumstances. A failure to use reasonable care is considered negligence. Violation of a motor vehicle statute or regulation is evidence of negligence as well, or it can be negligence *per se* if the violated statute is one that has been enacted for the safety of the public while using the roadways. Thus, in order for Ms. Fields to succeed in this negligence action, she must prove by a preponderance of the evidence that Defendants failed to exercise reasonable care under the circumstances, or that they otherwise failed to conform to some applicable standard of conduct, and that the failure was the legal cause of the harm suffered by her. However, under Delaware's comparative negligence statute, a plaintiff is barred from recovering damages for negligence that results in injury to a person or property where the plaintiff's own negligence was greater than that of the defendant (i.e. where the plaintiff was more than 50% at fault for the accident). *See* 10 Del. Code §8132.

As stated, Ms. Fields must establish Mr. Satinsky's negligence by a preponderance of the evidence.[1] "[A] party proves a fact by a preponderance of the evidence when [she] proves that the

---

[1]"[A] preponderance of the evidence is defined as::

> Evidence which is of greater weight or more convincing than the evidence

4

fact's existence is more likely than not." *Greenwich Collieries v. Director, Office of Workers'*

*Compensation Programs*, 990 F.2d 730, 736 (3d Cir. 1993). A "'preponderance' is not dependent

upon the number of witnesses testifying on either side but rather upon the credibility which, in the

light of all the evidence in the case, the jury attributes to their testimony and the effect of that

testimony in inducing belief in its truth". *Burch v. Reading Company*, 240 F.2d 574, 578-579 (3d

Cir. 1957). "[T]he [fact finder] must be convinced by the fair preponderance of the evidence that

the facts were as the plaintiff asserted them to be." *Id.* at 579. "If in the mind of the fact finder the

evidence seems equally balanced the charge is not established and the complaint must be dismissed."

*Virgin Islands Labor Union v. Caribe Construction Company*, 343 F.2d 364, 367 (3d Cir. 1965).

## B. Credibility

Testifying for Plaintiff at trial were Ms. Fields and her daughter, Nicole Fields-Lewis. Mr.

Satinsky testified on behalf of himself and his employer.

Ms. Fields testified that the accident at issue occurred on a Thursday night between 11:15

and 11:30 p.m. *See* N.T. 3/17/11 at 41. She had left her place of employment at Comcast in

---

which is offered in opposition to it; that is evidence which as a whole shows that the
fact sought to be proved is more probable than not.

    *Black's Law Dictionary* 1182 (6th ed. 1990).
Moreover, this court has recognized:

    [The fact-finder] must at least be convinced that the evidence considered
as a whole, its "preponderance" to use the traditional term, indicates that the facts
asserted by the plaintiff are probably true... *[I]f in their minds the probabilities of
those facts being true or false appear equal the plaintiff has not met his burden of
proof and a finding for the plaintiff would be inconsistent with the [fact finder's]
duty to render a true verdict.*

    *Burch v. Reading Co.,* 240 F.2d 574, 579 (3d Cir. 1957) ([emphasis in
original]), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957); *accord
Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1124 (3d Cir. 1992).

*Greenwich Collieries v. Director, Office of Workers' Compensation Programs,* 990 F.2d 730, 736 (3d Cir. 1993).

Wilmington, Delaware, driving her Nissan Sentra, to pick up her granddaughter at a "night day care"

facility in northeast Wilmington. *Id.* at 43. She described her journey and the accident as follows:

Q  Tell Judge Angell what route you took.

A  Your Honor, I would leave Comcast. Comcast is located on 4008 North Dupont Highway. I would get in my vehicle after warming it up, and I would head northbound, going toward Wilmington.

I would turn left from Route 13 onto West 2nd Street, and I would, after turning left, get in my right-hand lane because I know that I will be turning right onto Adams Street, North Adams Street.

I would take North Adams Street all the way out until I got to 10th Street. Once that light, that light there's an intersection there, turned green I would proceed toward Interstate 95, which is what I did every night I worked that shift.

As I was going onto the highway from West 10th Street onto I-95 northbound, I was driving in my far right-hand lane, because my exit was only a couple of miles up the road, which is Concord Avenue, Concord Pike.

So, it's Concord Pike to the left, it's Concord Avenue to the right, and I was right there through the intersection that Delaware Avenue actually has coming onto 95 also. It's about four minutes away from where I get on at.

Q  Four minutes. It's four minutes north of where you got on?

A  Four minutes north of where I got on there.

Q  So. You had been on the 95 for a few minutes before you got to the Delaware Avenue entrance way?

A  Correct.

Q  You were in the right-hand lane?

A  I was in the right-hand lane.
. . . . .
A  There was no traffic at all. Traffic was very minimal. I could look in my rear-view mirror and, Judge, I could see traffic, but it was so far back that I felt like I could have been off before it caught up to me.

But, like I said, it was just about – I was through the on-ramp from Delaware Avenue to 95 when I felt the impact. I didn't know

what at that time had hit me. I just knew I was crashed into, something had really hit me, and had hit me hard.

Q Where did the impact – what part of your car was impacted, to the best of your understanding being where you were?

A To the best of my understanding, it was in the back, because I could feel it.

. . . . .

A Your Honor, when I felt the impact I had looked at my car wheel, and my wheel, it looked fine. I thought my car was great. I felt something hit me. I didn't know what it was, and I was driving and then all of a sudden my wheel started shimmying, and that's when I said oh, my, something's wrong, and it started spinning in a counterclockwise position toward the left-hand side of I-95.

I'm going about fifty-five miles an hour, so as I went to spin counterclockwise toward the left, the car just immediately like when it impacted the cement guardrail it really impacted hard. I was seat belted in, but I was like thrown about really hard. . . . then it continued to skid, going back toward a clockwise position on the opposite side of the road.

At this point, Your Honor, is when I observed, I looked out of my window, my driver's side window, and I looked, and that's when I seen what looked to be, maybe it was my perception because it was so dark, and maybe being so little it looked like a monster to me because it was so big.

That's when I noticed that it was out of control, and that's when I said oh, my, god, I just got hit by a tractor-trailer. . . . I could see him rolling the wheel and turning the wheel, but the tractor-trailer was like in two different lanes, like it wasn't straightened up.

By this time, I had crashed, because I was looking but I wasn't paying attention to where my car was going, and I had actually impacted the right-hand side of 95 . . .

. . . .I went to push my brake, because my car is still moving. I went to push my brake to slow my car down, and to my amazement my car slowed down. . . .

It slowed down. When I went to push the impact – I mean the door release button, it unlocked itself without any help from anybody. It unlocked itself and I took my foot, my left foot, and I didn't know if it was going to be jammed, but I just kicked it open with all my force and the door opened up.

. . . . Before all this happened, I must tell you as I was looking out of my window and I observed the tractor-trailer was still not in

control, he still didn't have control of his rig, and the trailer part of his tractor was coming directly at me.

.  .  .  .  .

His trailer came directly at me, and it was really odd because he smashed up against my car. It was like just this loud bang, and then he came and he moved right – as soon as he hit me he came right off of me, and that's when I could see him working with his wheel. He was really, really, working with his wheel.

He finally got his truck under some kind of control, because when he hit me he was in a just like a V shape, it was like the front of it was in one lane and one part of it was in another lane, and he finally got it straight and he pulled up maybe a mile up, a half a mile up the road, parked on the right-hand shoulder where I was parked at . . .

N.T. 3/17/11 at 43-48.

Mr. Satinsky testified that his drive began routinely also. Working for NFI Industries, Inc., he would begin his evening around 4:00 p.m. when he would get instructions from his boss as to what he was supposed to do that particular night. *See* N.T. 3/17/11 at 150. He testified:

Normally we worked at Cott Beverage in Concordville, Pennsylvania, we were actually, what they call a dedicated account. The first thing we would normally do is pick up a load of full soda bottles, their product, and take it to the warehouse in Aston which was approximately nine miles away.

At that point we would do what we call in the trucking industry a drop and hook, we would drop the one trailer, either back it into a door or leave it on their parking lot, pick up an empty trailer and then head down to Haver [*sic*] de Grace, Maryland where would pick up empty soda bottles from a company called Constar, and they make all the bottles.

At that point we would drive them back up to the Cott warehouse in Concordville and do another drop and hook, pick up another load of sodas, and we normally did two to three of these loops an evening.

N.T. 3/17/11 at 150. Mr. Satinsky was operating a 1994 Freightliner Century Class tractor with a fifty-three-foot trailer on the night in question. He had gone down to Havre de Grace to pick up a load of bottles, and he was on his way back up. *See* N.T. 3/17/11 at 152-153. He describes the

accident with Ms. Fields as follows:

Q  What I'm going to ask you to do, please, is to in your own words and in as much detail as you can, just tell the Court exactly what happened on that particular night.

A  It was a little bit after 11:00.  I hadn't looked at my watch to see the exact time, but apparently it was about quarter after or so.  I was in the right-hand lane coming north on I-95 and nice weather, you know, very little traffic, no problems or anything.

I was driving along and I passed the entrance to, I forget the name of the street, and I felt the truck rock a little bit.  Like if you were in your car and somebody rocks the roof goofing, like that, not where I got thrown around, but just I could feel something.

At that point I hit my brakes and started slowing down.  At that point I saw Ms. Fields' car coming in front of the truck, she had – when me and the police officer looked it over, she had hit my right rear tire.  There is twin axles back there, she hit the front axle outside tire, there was a big scuff on it.

She traveled past the front of the tractor, spun around, hit the guardrail on the left-hand side, came back in front of me and spun around again and hit the guardrail on the right-hand side where she came to rest.
. . . . .
THE WITNESS:  Okay. Now, right now we have three lanes of the highway.  There is another lane being added, this is where the entrance to the (inaudible) are.

BY MR. BERGER:

Q  What lane are you in?

A  I'm in the right hand, right rear lane.

THE COURT:  You were not coming up the ramp?

THE WITNESS:  No, I was on the highway.

BY MR. BERGER:

Q  How long had you been on Route 95 North in the far right lane?

A  Pretty much forever, there was very little traffic.  Normally, the

only time I get into the middle lane would be if somebody needs to merge in, pull over to let them in and then you pull back over, it is just courtesy.

THE COURT:  But at that point you had come up already?

THE WITNESS: Yeah, I was already – I had been on 95 since Maryland.

. . . . .

A  Okay.  So I did notice here coming up here, but she came up and she hit this tire and careened off, went in front, hit the guardrail, came back around like this and banged into this guardrail and came to rest. Now, meanwhile, these things don't stop as fast as a car, her car stopped when I was in front of her.

At that point – and the truck never did jackknife.  The police officer and me went out and looked at the skid marks and they were a straight line, so –

. . . . .

Q Did it skid a little bit though?

A  Yes, the rear tire skidded, simply because I only had about five thousand pounds.  Now, on a full load, I can carry like forty-three thousand pounds, so it was a light load.  But, it didn't –

Q  Did you leave the right lane at all?

A  No, not at all.  In fact, the skid marks look like somebody drew them on the street with a magic marker, they were perfectly straight.

. . . . .

Q  Where is on the ramp?

A  The on ramp comes on, it goes up and then goes back off like that.

THE COURT:  Yes, so there is an extension.

THE WITNESS: Yeah.  So at this point there were four lanes, there were actually four lanes at this point, right.

THE COURT:  Okay.

BY MR. BERGER:

Q  There was some issue about there is some property damage that is

10

back here and here. Can you explain to the Court how the car got damaged here and here?

A  That would be hitting the two guardrails. Now, a lot of people think the front bumper on these trucks is like some kind of monster, a five beam or whatever, actually it is a cover. It is the same as it is on your car, it is plastic.
    If I would have hit her that hard, my bumper would have been all over the street just like hers. I had no damage to the vehicle.
                        . . . . .
Q  The plaintiff had testified that when she was coming along she was able to see you doing something with the wheel.

A  Now, that is another thing. If she was like this, her line of sight I would have thought if she is right here would have been blocked by her roof and my hood.

Q  Is that –

A  I couldn't see her, so I don't see how she could see me.
                        . . . . .
THE COURT:  She bumped and then started to spin?

THE WITNESS:  She bumped here. She had to be going a lot faster than me, because she bumped like this, went around like this, banged there. Meanwhile, I'm coming up here, almost hit her there, and then she hits the guardrail and stops.

THE COURT:  You hit her a second time, or did you hit her at that time?

THE WITNESS:  No, otherwise the front end of my truck would have been messed up.

N.T. 3/17/11 at 154-160.

The differences in the parties' testimony is evident, and further questions come to the fore as they describe what transpired immediately after the accident. At trial, Ms. Fields describes Mr. Satinsky running back to her from his truck "hollering and screaming and telling me to shut up and be quiet, that I wasn't hurt". *Id.* at 48-49. During her depositions, Plaintiff had stated that ". . . the

guy was like scaring me. He was running towards me. He was yelling like all types of obscenities --obscene words at me, at my – I didn't tell my lawyer. He was freaking me out. He was telling me to shut up and stop screaming and hollering and all that crazy stuff. I was scared. I was out there my myself, a female, at that." Defendants' Exhibit 1 at 27. "Now, when the guy started harassing me and calling me all kinds of names I'm not going to repeat, because my lawyer didn't even know that, he was telling me to shut up, and that I wasn't hurt." *Id.* at 28. Continuing her deposition testimony, Ms. Fields testifies:

> Q. You mentioned that a man used obscene words towards you. Who was the man that –
>
> A. The truckdriver.
> . . . . .
> A. . . . he was running towards me, and I didn't know if he was running towards me to hurt me. He was – I just seen a guy running towards me, and I was hysterically screaming, because I couldn't believe I had survived such a terrible accident. I was in shock, I guess. All I remember him saying was, shut up. You're not hurt. Shut up. There's nothing wrong with you. Shut up.
> That's his exact words.
>
> Q. Well, you said he used some obscene words.
>
> A. Well, to me, those are obscene words. I don't like people telling me to shut up and – and not even ask me am I all right.
> . . . . .
> Q. You said he used obscene words towards you.
>
> A. He didn't use profanity, okay, but he used very, very nasty language toward me.
>
> Q. Did he say anything else besides shut up, be quite [*sic*] and nothing is wrong with you? Is there anything else he said?
>
> MR. EDELSTEIN: You're not hurt.
>
> THE WITNESS: He wasn't concerned about whether I was hurt. He

wasn't concerned about anything else. I thought the man was actually coming to do some physical damage to me, because of the way he was coming towards me. I was very afraid for my life with this man. That's why I started making phone calls to get somebody out there, because I was alone with this truckdriver on 95 with nobody else out there, alone with this man and he was terrifying me.

Defendants' Exhibit 1 at 29-30. When questioned at trial concerning Mr. Satinsky's approach to her, Ms. Fields denied the above deposition testimony, intimating that the court reporter at the deposition changed her testimony.

A  You know what, that doesn't even sound like the way that I would phrase stuff. I don't know how you got that. I mean I know that person was in that room but how you got that stuff written down on that paper, that's not even the way I talk.

I don't talk like that, so I don't know how you're putting your words together, but I'm not going to agree under oath to say that I said something that I know I don't say in that form or that context.

I said I felt threatened by him, and I will continue to say I felt threatened. He was coming toward me in a threatening way. He was telling me to be quiet and shut up. I never – he – I never told you he cursed me. I don't know where that came from –

Q  Okay.

A  – or anything. I never said that. But he – I felt threatened by the man. The man did specifically tell me to be quiet. He told me I wasn't hurt. He told me to be quiet, shut up, you're not hurt. And I will continue to say that, and I will take a lie detector test to prove that I'm not lying. He did say that to me.

Q  Your testimony is the court reporter changed your testimony? Is that what you're saying?

A  Excuse me?

Q  Your testimony is the court reporter changed your testimony, is that correct?

A  Whichever way you want to take it.

N.T. 3/17/11 at 131-132; *see also* N.T. 3/17/11 at 134-135.  In her deposition testimony, Ms. Fields related that Mr. Satinsky was running towards her.  *See* Defendants' Exhibit 1 at 27.  At trial, she was asked again: "[d]id Vincent Satinsky run toward you after this accident?"  She responded: "I don't know because his legs are so long.  Walking fast could have looked like running to me because I'm only five foot and he's a pretty tall man; so he has long legs."  N.T. 3/17/11 at 133.  "I said he walked toward me."  *Id.* at 132.  Ms. Fields stated at her deposition that it was upsetting to her that Mr. Satinsky did not "even ask me am I all right".  Defendants' Exhibit 1 at 29; *see also* Defendants' Exhibit 1 at 30, 31.  Yet, at trial, she mentioned more than once that he asked her if she was all right. *See* N.T. 3/17/11 at 49, 132.

   Mr. Satinsky's accounting of his interaction with Ms. Fields differs considerably:

   Q  If you could just continue with what happened.

   A  Well, then what happened is I pulled the truck over and I was now parked in front of her, because like I said, it takes longer to stop the truck.  So, I did, in fact, run back to her car because I was hoping she was okay, you know, because it looked pretty bad.
      So, I run back to the car and she had her window down and she kept screaming, "Why did you hit me?", and I kept saying I didn't hit you, you hit me and she, "Why did you hit me?".
      So, finally I said, well look, look, let's not worry about that, what I need to know is are you okay?  She said yeah, I'm a little shook up, but I seem to be okay.
      She got out of the car and at this point there was another guy that had pulled over, okay, I don't think he stuck around to give his name or anything, but at any rate, he had called 911.
      So, I guess it was about ten minutes later or so, they showed up, it was one police officer and then the ambulance showed up right after that and then lots of them.
      But while we were waiting she called her daughter on the phone, in fact, she was on the phone the whole time we were waiting, but she called her daughter on the phone and was telling that she was okay.  Apparently her daughter didn't believe her or whatever, so she handed me her phone and I told her daughter she was okay.

14

Now, I don't know if it is this daughter or not, and she forgot about the conversation but I told her daughter she was okay, she didn't seem to be hysterical at all.

. . . . .

Q There are references within the hospital records to her being hysterical. You didn't go to the hospital with her, correct?

A No, no. I was there until they put her in the ambulance and everything and took her away. But she seemed to be calm.

Q Did you at any point say to her shut up, or anything like that?

A No, I mean what I said was, hold up, hold up, we will worry about that, are you all right?

Q Okay.

A Like I said, I did run back there because I was concerned that she was okay. But basically we kind of hung out together waiting for everybody to show up.

N.T. 3/17/11 at 162-164, 180-181.

At the accident scene, Ms. Fields was not bleeding; however, she complained of bruising. *See* Defendants' Exhibit 2 at 50. The police and paramedics arrived on the scene whereupon Ms. Fields was placed on a gurney and taken to the hospital. Mr. Satinsky states that he and Ms. Fields were not together once the police and paramedics arrived, but he saw her being taken away by ambulance. *See* N.T. 3/17/11 at 181-182. The paramedics describe Ms. Fields' behavior as "totally hysterical". *See* Plaintiff's Exhibit 19. As they attempted to ascertain Ms. Fields' injuries, they reported her being hysterical as they questioned her. She also refused to let them cut off her clothing, stating she had to pay for her work uniforms.[2] *Id.* Ms. Fields was met at the hospital by her

---

[2]Ms. Fields testified at her deposition:

Q. Did they cut your clothes off?

A. They were about to. They took my coat off of me, my uniform coat, and --

15

daughter, Nichole Fields-Lewis, who also testified at trial. In describing her mother's situation, Ms.

Fields-Lewis related that Ms. Fields' clothes were cut off in the ER. *See* N.T. 3/17/11 at 25, 29, 30.

Confusion remains in regard to Ms. Fields' clothes when she testified at trial that, . . . "my daughter

didn't know, they were able to get my coat off, but everything else was cut off of me at the hospital.

because they said if they didn't get if off of me, they would have to cut it off me.
They basically took it off me and strapped me onto the gurney with the neck brace.

Q. Did you refuse to let them cut your uniform?

A. I asked them not to. It was very cold, and I didn't want to end up with no coat
at all to work in.

Q. There's a reference within a record I saw that you had refused to let the EMT
crew cut your clothing.
        Did that happen or not happen?

A. I asked them not to cut my coat off of me.

Q. Did they say we want to cut your clothes off and you said, "I'm not going to let
this happen

A. No, it was never stated.

Q. What?

A. No, it was never put to me like that, in that form.

Q. Did you indicate to them that you have to pay for your work uniforms –

A. I did.

Q. --and you didn't have the money to do so?

A. I do.

Q. You did say that?

A. I did.

Q. But you didn't refuse to let them cut your clothing?

A. No, they said, well, if we don't cut them off, you'll tave to take it off and it's
cold out, so, you know, you'll be cold for a minute. I said, that's fine, and they
were able to remove it a different way without cutting – without cutting it.

Defendant's Exhibit 2 at 50.

16

So. I don't know where the coat was. If they cut it somewhat, but didn't cut it completely up, but they didn't have any of my clothes when I left. When I left the hospital, I left wearing a hospital gown, and a pair of pants, and some booties. They didn't have any of my clothes." N.T. 3/17/11 at 54.

Emergency Room records reveal that Ms. Fields was extremely tearful and upset; she was kicking and screaming after speaking to a police officer. Upon being asked at deposition if she recalled anywhere that she was bruised when she was in the ER, Ms. Fields replied "No, I don't. I don't know." Defendants' Exhibit at 50. At trial, she testified:

> Q Let's go to this accident for a minute. After this accident you were not bleeding from any part of your body despite being thrown around violently, as you said, correct?
>
> A That's correct.
>
> Q And when you're in the emergency room were you kicking your legs and screaming when the police officer talked to you?
>
> A I have no idea what I was doing, sir. I was hysterical. I have no idea what I was doing.
>
> Q Can we agree that you sustained no visible bruising, no physical evidence of injury that was present let's say three days after this happened?
>
> A I had bruising to my body that you couldn't see, but I could see.
>
> Q Okay. Were there any bruises that anybody could see three days after this accident? Were there any visible marks on your body?
>
> A Yeah, I could see them, yeah.
>
> Q So there were still visible marks on your body –
>
> A Yes.

Q  – three days after the accident?

A  Yes.

Q  How long did it take until they went away?

A  Maybe a week or two before that redness and before the – before all the blue marks – black and blue marks that was on my legs and arms disappeared.

Q  At page fifty-four of your deposition, the second deposition, when we continued it September 22nd, 2010, line nineteen, I'm asking any visible marks on your body after three or four days from this accident?"
        Your answer was, "No," and I can show it to you if you want. Does that refresh your memory that after three or four days you didn't have any bruising?

A  I had bruises on my body.
                                    . . . . .
Q  Okay.  And I'm just asking about those visible marks, or the bruises on your body, at page fifty-four, line nineteen.  I'm asking, "Any visible marks on your body after three or four days from this accident?"  Your answer was, "No." Is that true or not true?

A  No, I don't know about that.

Q  Okay.

A  That could have been another day when I was tired.  There was bruises in areas of my body that I wasn't likely to take pictures of and send them in because they were in personal parts of my body that was bruised.

Q  You're not alleging any injuries from this accident to any personal parts of your body, is that fair?

A  I was bruised, very much so bruised.

Q  In your private areas, you're saying?

A  They were just areas that I didn't want to depict or show.

Q  You did not report any injuries to any personal parts of your body to any doctor, nurse, or health care provider ever, is that fair?

A  I told my doctor that I had very bad bruises.

Q  Did you tell your doctor you had very bad bruises in any sensitive, personal area?

A  I'm not sure if I told him exactly where.  I just told him I was bruised.

Q  If I told you that the records reflect no evidence to any injury, damage, bruising, contusion, abrasion, et cetera to –

A  They said I was –

Q  --any personal area --

A  They said I was bruised inside and out.

N. T.  3/14/11 at 113-116.  Ms. Fields was discharged from the ER to her home with a diagnosis of

neck/back strain and concussion.  *See* Plaintiff's Exhibits 20, 21.

Testimony was received at trial concerning Ms. Fields' life before this accident and her life

now.  Testifying on her mother's behalf was Nichole Fields-Lewis.

Q  Between a couple of years before the accident and the day of the accident, can you just describe for Judge Angell your mom's condition, as far as you knew it to be?

A  My mother has always been active.  She goes to church.  She has a very boisterous personality, so she was involved in everything, especially since she takes care of my niece, has been for the last five years.
        She does everything that a parent would do.  So, you know, before Nia became school age, it was parks, it was birthdays, it was whatever was involved, and she was always running around.
        She's always been a person that never took medicine, and when I tell you she never took medicine, like she didn't even like to take Tylenol.  She would have the stuff, but she just didn't like it.  She said she didn't like the way it made her feel.

19

So, she remained active. That was why she was able to do security, and that was why she was able to be in housekeeping, because she still had full functions of her body, her knees, her legs, even with the carpal tunnel. She was still able to do things because she just wasn't going to let it stop her, that's just her mind set.

Then do I talk about –

Q Well, my next question, Nicole, was going to be tell Judge Angell how it has been since the accident.

A It's a flipped person, completely flipped. My mom is fearful. She has nightmares. I've been in the house when she went to sleep, she's drifted off to sleep, and she'll wake up in a panic. She's seeing a psychiatrist now.

I mean, everyone experiences problems, but my mom's never been one to be on psychiatric medicine. She is seeing a psychiatrist now, and she doesn't take the highway. She'll go every way but the highway. She'll take the longest route to get to someone.

She has to be active for my niece, but every day is a struggle, because she has to start her day with medicine just to get out of the bed, and then she has to deal with the day's events, and the medicine has its own side effects because it causes her drowsiness.

A lot of the times some of it is irrationality. I mean, she sometimes when talking she can't produce proper speech right because the medicine has its own lag side effects and then, of course, when you combine the psychiatric medicine with the pain medication, it just makes her very immobile and her speech is deficient.

So, a lot of times the clarity that I'm used to my mom having she doesn't have. The way that she used to be able to communicate, she can't communicate like that any more, and the way that she was active with my niece, she can't be active in that way any more, and to a five year old they really don't understand.

She knows, you know, she knows about the issue with the car and everything of that nature, however she doesn't understand why we don't go to the park when I want to go to the park, and why we can't just take long walks when I want to take long walks, and things of that nature. It's night and day, and a lot of times, and even today when you talk to my mom you'll see what I'm talking about.

Speech wise, you didn't know her before, but now it's completely different because the medicine plays in every aspect of her life, from mobility, to mental comprehension, down to her speech. Everything just rains down, just like that.

N.T. 3/17/11 at 19-22. On cross examination, Ms. Fields-Lewis reiterated that prior to this accident, her mother never took medicine, and now she does. According to her daughter, in the five years before this accident, Ms. Fields did not take Percocet, Oxycodone, Ambien, or any medication at all. "She got it, but no, she wouldn't take it." *Id.* at 22-23. The only prior health problem she had was carpal tunnel syndrome. *See* N.T. 3/17/11 at 23. When asked what parts of Ms. Fields' body were hurt in this accident, she responded: "[h]er neck, as I stated, her back, everything hurts on her, knees, everything, everything hurts". N.T. 3/17/11 at 23. Ms. Fields-Lewis reported that the mother had knee problems before this incident; however, she had no neck or back problems in the past that would keep her from doing anything. If she did, she never took medicine for it. She noted that Ms. Fields had prior psychological problems about twenty years earlier in that she suffered from depression. Ms. Fields-Lewis further stated that her mother does not drive on the highway at all now. *See* N.T. 3/17/11 at 24.

Much of the testimony of Ms. Fields-Lewis is contradicted and, in fact, discounted by the testimony of her mother at trial, who stated that she was "just starting to really get back on the highway, to start using the highway again . . .". N.T. 3/17/11 at 69. It came to light that Ms. Fields had three previous rear-end collisions, two in 2004 and one in 2005. *See* N.T. 3/17/11 at 70-71. Her injuries from the first 2004 accident were bad enough that she submitted to CT scans of her neck and back. *See* N.T. 3/17/11 at 74.

> Q Okay. So your daughter's testimony that you had no problems in the five years before the accident is inaccurate, can we agree?
>
> A It's probably pretty much.
>
> Q Okay.

A  She probably didn't really think about those other accidents that I had had.

Q  Fair enough.  And you hurt your upper back, your middle back, and your lower back in the first 2004 accident, correct?

A  Yes.

Q  And you had pain that traveled into both of your legs after the first 2004 accident, correct?

A  More in my left.

Q  Did you have pain in your right leg as well?

A  Yeah, at times, but it was more centered in my left leg.

Q  Did you have extreme pain in your right leg after the first 2004 accident?

A  I just said yeah, but it was more centered in my left leg –

Q  Okay.

A  – more so.

Q  And the pain was bad enough in the first 2004 accident that you would sometimes not even be able to walk, you would have to stop and sit down for awhile, correct?

A  That's correct.
                                . . . . .
Q  And your testimony is that you completely recovered from your first 2004 accident some time around 2005 or 2006, correct?

A  Well, I was – I was fully recovered before 2008.

N.T. 3/17/11 at 76.  Ms. Fields-Lewis' testimony that her mother preferred not to take any

medications is also belied by Ms. Fields' own words.

Q  You were asked a few minutes ago by your attorney on direct examination about medication you taken for this accident involving

Mr. Satinsky in 2008.

Now, isn't it true that you took oxycodone, sleep medication, and muscle relaxers for your first 2004 car accident?

A  I've never been on oxycodone.  I've been on Percocet.  It's a big difference.

Q  You didn't take oxycodone –

A  I took –

Q  – three to four times a week for a whole year?

A  I took Percocet, Endocet.  Oxycodone is oxycodone.  Endocet is Endocet.  And Percocet and Endocet are from the same family.  I've never been on oxycodone but once.

Q  You were never on oxycodone before the accident with Mr. Satinsky?

A  It was prescribed to me, but I never took oxycodone.  I've taken Endocet.

*Id.* at 77-78.  Counsel pointed out to Ms. Fields that she had stated at her deposition that she had been taking oxycodone three to four times a week for about a year and that she was still on a sleep medication.  Though she took Ambien prior to the accident, she stated that she was taking Tramazone after the accident.  *See* Defendant's Exhibit 1 at 21-22.  At trial, Ms. Fields insisted that she had been taking Endocet.  *See* N.T. 3/17/11 at 79.

In Ms. Fields' second 2004 accident, she was rear-ended, and she was treated and released in the emergency room.  *Id.* at 80.  She testified that she continued to have neck problems, head problems, back problems and problems radiating into her legs.  *Id.* at 81.  In 2005, Ms. Fields was rear-ended and again, and she was also treated and released in an emergency room.  *Id.* at 82.  She suffered from pain in her neck, back, head, hips and both legs.  *See* N.T. 3/17/11 at 82-83.

Ms. Fields testified that she was completely recovered from the above prior accidents. She had no symptoms, problems or complaints that she knows of. *Id.* at 84. The record reveals a correspondence from Matthew J. McIlrath, D.C. in which he reports on the injuries received by Ms. Fields in her two 2004 accidents. He opines that Ms. Fields "sustained moderate permanent impairment to the soft tissue associated through the cervical, cervicothoracic, and upper thoracic regions as a direct result of the two accidents 12/08/04 and 12/15/04. . . . Future treatment required for the cervical, cervicothoracic, and post traumatic headaches directly related to the above stated accidents will be in the form of as needed care, which is likely to be necessary one to two times per month over the next three to five years". Defendants' Exhibit 9 at 211-212. At trial, Ms. Fields did not remember Dr. McIlrath telling her that. *See* N.T. 3/17/11 at 86. In regard to the 2005 accident, correspondence from Robert A. Smith, M.D. reveals that Ms. Fields came to him with complaints of constant pain in her upper and lower back areas. *See* Defendants' Exhibit 9 at 300-302. Upon being questioned at trial, Ms Fields responded:

> A  If that's what I stated, then that's what was going on at the time.
>
> Q  All right. And, again, I remind you your daughter said that you had no back pain before –
>
> A  My daughter doesn't know everything. She doesn't live with me.

N.T. 3/17/11 at 87. Dr. McIlrath ultimately opined concerning all three of Ms. Fields' 2004/2005 accidents. "Ms. Fields will maintain permanent impairment within a reasonable degree of medical and chiropractic probability to the cervical spine, thoracic spine, lumbar spine, bilateral shoulders and gluteal region as a direct result of the above stated accidents." Defendants' Exhibit 9 at 246-247. Ms. Fields had no idea why Dr. McIlrath would issue such a report. *See* N.T. 3/17/11 at 92.

> Q  Does that refresh your memory that maybe you weren't all better?
>
> A  Yeah, he never discussed that with me.

*Id.*  A History and Physical Report #1 from the Family Practice Associates, PA dated December 18, 2007, reveals that Ms. Fields came to them complaining of arthritis, as well as back pain which had been occurring in a persistent pattern for four years, and it had been gradually worsening.  In fact, it was reported that she was taking a friend's Percocet to attain relief.  *See* Defendants' Exhibit 22 at 1352.  Ms. Fields had no idea why her family doctor records would make reference to worsening back pain over four years in December, 2007.  *See* N.T. 3/17/11 at 95.  She testified that "that report is all wrong".  N.T. 3/17/11 at 96.  "There's more than one Sharon Fields in the world."  *Id.* at 96.  Ms. Fields elaborated on that testimony:

> Q  Did you, in fact, tell her that you had back pain for four years which was worsening, that it was aggravated by bending and twisting, and that you were taking a friend's Percocet to relieve your back pain?  Did you tell her that?
>
> A  No, never told her that ever.
>
> Q  Do you have any idea why the records I got from her office in response to the subpoena say that?
>
> A  No, I have no idea.  That's definitely not – no.  I would never tell a doctor I'm taking a friends medication, never.
>
> Q  You claim injuries to you –
>
> THE WITNESS:  That's incorrect, Your Honor.  I don't know where you obtained that information from.  That's totally incorrect, Your Honor.  I would never tell a doctor that I'm taking another friend's medication to relieve pain.
>
> . . . . .
>
> THE WITNESS:  . . . But I've never ever told her I was taking anybody else's pain medication, so I don't know where you got that statement from.

MR. BERGER: Okay.

THE WITNESS: It's completely wrong.

N.T. 3/17/11 at 101-102.

The discrepancies continue in the testimony at trial. There was further discussion of accidents sustained by Ms. Fields. She was involved in a slip and fall accident in 1995. At trial she testified that the accident "didn't amount to anything. . . .there was no settlement made on that or nothing". *Id.* at 103. At her deposition, Ms. Fields stated that the case was "settled out of court". Defendants' Exhibit 1 at 25.

> Q . . . Why did you say on September 7, 2007 you settled out of court and recovered money if you didn't?
>
> A Your Honor, at the time that this deposition was taking place he was out – it was a very lengthy, very long deposition, Your Honor. As a matter of fact, I had to stop it because I had to run back to Wilmington to relieve, and I don't know if something was said out of context, but what I can tell you, Your Honor, is that that case was never ever settled. I actually let that case go. It was never settled at all.
>
> So I don't know why that statement was made. I don't know if it's maybe because I was tired, because it was so many questions, it was very lengthy, I had other obligations, I had to get back to Wilmington, I had to pick my granddaughter up from school, and I was just very, very emotionally and mentally drained.
>
> So maybe something got said out of context. But what I can tell you for certain and what I can swear to on The Bible is that that lawsuit was never, ever settled, ever.

N.T. 3/17/11 at 105. In a discussion concerning Ms. Fields' work as a security officer at Olive Garden after the accident, counsel asked

> Q And for the next year and two months you continued to work thirty-two hours a week doing what you did before, correct?
>
> A I sure did.

Q  And then you had a confrontation with a supervisor, your hours were cut, and ultimately, you got laid off, correct?

A  Yeah, well, I didn't have a confrontation with my supervisor.

Q  You did not have a confrontation with your supervisor?

A  I didn't have a confrontation with my supervisor.

Q  Let me show you page fifty-one of your deposition on September 7th, 2010.
   "Question: Then you had a confrontation with your supervisor and your hours were cut?"  And you answered, "Correct."  And I'm sure you said it somewhere else as well.
   But why in the world did you answer "correct" to that question if you didn't have a confrontation with your supervisor?

A  No, it wasn't a confrontation with my supervisor.

N.T. 3/17/11 at 120-121.

### C. Conclusion

The facts surrounding the motor vehicle accident at issue, as asserted by Ms. Fields, are confusing at best.  She contradicts herself, dismisses the testimony of her daughter, and more than once intimates that the court reporter at her deposition altered her testimony.  She also suggests that her medical records are incorrect.  I am not convinced by the fair preponderance of the evidence that the facts are as Ms. Fields asserts them to be.  Without a clear understanding of exactly what happened on November 19, 2008, it is not possible to ascertain whether or not Mr. Satinsky failed to exercise reasonable care under the circumstances or otherwise failed to conform to an applicable standard of conduct, causing the harm suffered by Ms. Fields.

Judgment will be found in favor of Defendants and against Plaintiff.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARON FIELDS | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VINCENT A. SATINSKY | : | NO.  10-2254 |
| NFI INDUSTRIES, INC. | : | |

## <u>ORDER</u>

AND NOW, this 17th day of May, 2011, after conducting a Summary Trial in the above-captioned matter, and finding that Plaintiff has not proven Defendants' negligence by a preponderance of the evidence, it is hereby **ORDERED** that judgment is entered in favor of Defendants Vincent A. Satinsky and National Freight, Inc., incorrectly designated as NFI Industries, Inc., and against Plaintiff Sharon Fields.

BY THE COURT:


 S/M. FAITH ANGELL                                  
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
Robert N. C. Nix, Sr. Federal Building, S/211
900 Market Street
PHILADELPHIA, PENNSYLVANIA  19107

Chambers of
 M. FAITH ANGELL                                      P:   (215) 597-6079
United States Magistrate Judge                        F:   (215) 580-2165

### *FAX / MAIL COVER SHEET*

CASE NO:  10-2254                          DISTRICT COURT JUDGE: ER
                                                        215-580-2362

TODAY'S DATE:     May 17, 2011            LAW CLERK'S INITIALS: LFS

<u>VIA FAX;</u>

<u>NAME:</u>                                          <u>FAX NUMBER:</u>

1.      Leonard B. Edelstein, Esq.                 (215) 731-1146

2.      Mitchell S. Berger, Esq.                   (215) 564-1301